IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

NYCAL OFFSHORE DEVELOPMENT
CORPORATION,
6 Albert Court
Kensington Gore
London, England
SW7 2BE,

                             Plaintiff,

        vs.

DAVID BERNHARDT, SECRETARY OF THE
INTERIOR,
1849 C Street, NW
Washington, DC 20240,

                             Defendant.

No. _____

**COMPLAINT**

Plaintiff Nycal Offshore Development Corporation ("Nycal"), by its attorneys

Anderson Kill L.L.P., as and for its complaint against Defendant David Bernhardt, Secretary of

the Interior of the United States (the "Secretary"), alleges as follows:

## INTRODUCTION

1.      This is an action seeking a judgment, pursuant to 28 U.S.C. § 2201,

declaring that Nycal is and has been since 1990 the owner of a fractional interest in a pair of

leases for oil and gas exploration in Federal submerged lands offshore of Santa Barbara,

California (the "Gato Canyon leases").

2.      Nycal has filed in the Court of Federal Claims an action seeking monetary

damages from the United States, based on allegations that in 2013, the Secretary's predecessor

purported to terminate the Gato Canyon Leases. *Nycal Offshore Dev. Corp. v. United States*,

Case No.: 1:19-cv-00505-MMS (Fed. Cl., filed April 4, 2019).  In that action, Nycal argues that

if the Gato Canyon Leases were terminated, the termination constituted a taking without compensation of Nycal's property.

3.    Nycal also claims that the termination of the Gato Canyon Leases was in violation of law and denied Nycal due process, and therefore the Gato Canyon Leases have never been legally terminated and remain extant.  Such a claim, if correct, would result in the dismissal of Nycal's money damage action in the Court of Federal Claims as there would have been no uncompensated taking.  Because the power of the Court of Federal Claims to issue a judgment declaring the rights of litigants against the Federal Government has been viewed in some cases as only extant when incidental to a monetary award, there is at least a serious question as to whether the Court of Federal Claims, were it to take the view that the Gato Canyon Leases continue to be in existence, could issue such a declaration in favor of Nycal, or would be limited to dismissing Nycal's action for money damages.  *See Keehn v. United States*, 110 Fed. Cl. 306, 335 (2013), and the cases collected there.

4.    Nycal seeks primarily to be able to proceed with the development of and production from the Gato Canyon Leases, which will necessitate the joining of all the fractional interests in those leases into a unit operating agreement.  Such an agreement will enable development and production, which was halted in 2001 by a Federal court order, to resume.  All of the remaining fractional interests in the Gato Canyon Leases are now possessed by the United States, which takes the view that the Leases no longer exist.  The only way for the development and production of hydrocarbons from the Gato Canyon to proceed, where the Court of Federal Claims in previous litigation has already held there are sixty million barrels of oil to be recovered and added to the nation's energy resources, is for the continued existence of the Gato Canyon Leases to be declared by a court of competent jurisdiction—this Court.

## THE PARTIES

5.    Plaintiff Nycal is a corporation organized under the laws of Delaware. Nycal's principal place of business is in London, England.

6.    Defendant David Bernhardt is the Secretary of the Interior of the United States.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331 and 2201.

8.    This Court has personal jurisdiction over Defendant Bernhardt as he is sued solely in his official capacity as an officer of the United States of America.

9.    Venue is laid in this Court pursuant to 28 U.S.C. § 1391(e), as the official residence of the Defendant acting in his official capacity is the District of Columbia.  *Lamont v. Haig,* 590 F.2d 1124, 1128, n.19 (D.C. Cir. 1978); *Mejia v. United States*, Civ. Action No. 18-2096 (PLF), 2018 U.S. Dist. LEXIS 169035, *7-8 (D.D.C. October 1, 2018).

## THE RELEVANT FACTS

10.    The United States has exclusive jurisdiction, control, and the power of disposition over the submerged lands on the outer continental shelf that extend beyond state-owned submerged lands.  The Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1301 *et seq.* ("OCSLA") grants the United States, acting through the Secretary of the Interior (the "Secretary"), the discretion to lease these Outer Continental Shelf ("OCS") lands for oil and gas exploration and development.[1]

---

[1] The term "Secretary" herein refers to any person or bureau of the Department of the Interior, unless otherwise indicated.

11.     According to their terms and applicable federal regulations, OCS leases run for a fixed period of either five or ten years ("primary term") and "as long [thereafter] as oil or gas is produced from the lease in paying quantities, or drilling or well reworking operations as approved by the Secretary are conducted."  30 C.F.R. § 256.37.  A lease that is not producing oil or gas in paying quantities within its primary term, or on which approved drilling or well reworking operations are not being conducted within the primary term, expires and reverts back to the Government unless the Secretary extends the lease beyond its initial period by virtue of a "suspension."  The Secretary can extend a lease either by granting a lessee's request for a suspension or directing a suspension on its own initiative.  30 C.F.R. § 256.73(a) & (b).  In either case, the lease does not expire as long as the suspension remains in effect.  *Id.*

12.     In 1982, after complying with the requirements of OCSLA as it then read, the Secretary conducted a sale of leases offshore of California, including the Gato Canyon Leases.  The Gato Canyon leases, given the numbers OCS-P 460, 462, and 464, were issued with a primary term of five years to a set of bidders who provided substantial cash bonus payments.  These leases were grouped into one "unit," and Samedan Oil Corporation ("Samedan") was designated as the "operator" of this unit.

13.     In 1990, Nycal purchased a 4.25313% interest in the three leases from a successor to one of the successful bidders for the Gato Canyon leases.

14.     Both before and after the Nycal purchase, the Gato Canyon leases were granted suspensions, having the effect of continuing the leases in effect.  Between 1992–1999, no work was being undertaken on the Gato Canyon leases—or on any of the other offshore California leases that had been sold in 1982—because of a suspension directed by the Secretary.

4

That directed suspension was to enable a study (the "COOGER" study) to be carried out concerning the status and future of oil and gas development offshore of California.

15.     In 1997, anticipating the completion of the COOGER study, the Secretary requested revised suspension requests for the leases. Samedan complied, and on November 12, 1999, the Secretary granted the request, including the achievement of a set of milestones during the suspension period. The last milestone was to be the drilling of a delineation well by May 1, 2003. In the letter granting the suspension, the Secretary stated that "[m]eeting these milestones is critical factor in our determination of whether the suspension continues, or whether potential future requests for suspension are granted."

16.     On November 15, 1999, the State of California filed suit against the Secretary in the United States District Court for the Northern District of California, alleging, *inter alia*, that he did not have the authority to grant the November 1999 suspensions without first determining that those suspensions would be consistent with California's coastal management program. The California action was based on Section 307(c)(1) of the Coastal Zone Management Act ("CZMA"), as amended in 1990, 16 U.S.C. § 1456(c)(1), which was enacted to "make clear" that the sale of oil and gas leases were subject to the CZMA.

17.     On June 20, 2001, the District Court held that, as a result of the 1990 CZMA amendments, lease suspensions are subject to the Section 307(c)(1) process. As the Secretary had not followed the 307(c)(1) requirements, the Court the Secretary to set aside the November 1999 suspensions, including all the milestone activities required by those suspensions, and directed the suspension of all activities under the leases. The effect of the holding was to freeze the leases in their degree of development as of June 20, 2001. *California v. Norton*, 150 F. Supp. 2d 1046, 1057-58 (N.D. Cal. 2001), *aff'd*, 311 F.3d 1162 (9th Cir. 2002).

18.     On July 2, 2001, in compliance with the District Court's order, the Secretary halted all operations required by the November 1999 suspensions.

19.     The June 20, 2001 Court Order and the implementation of the directed suspension had an immediate drastic effect.  The vessel on the way to the lease location to do sonic testing turned around, and the ongoing negotiations to retain a mobile drilling rig to drill the delineation well required as a milestone also halted.  To date, no further activity designed to lead to production from the Gato Canyon leases has been undertaken.

20.     The District Court had directed the halt to all activity on the lease until the Secretary complied with his obligation to provide the consistency determination required to comply with the CZMA.

21.     The Secretary never did so, leading to litigation by the great majority of oil and gas lessees from the 1982 sale seeking monetary damages from the United States for breaching their leases.  In 2002, many of the lessees, including other factional interest holders in the Gato Canyon leases, commenced an action in the Court of Federal Claims.  Nycal commenced its own action in that Court in 2005.

22.     The action by the lessees other than Nycal resulted in an award of restitution damages, which required the return of these lessees' leases to the United States.  This was accomplished by the assignment, on April 10, 2009, of the fractional leasehold interests in the Gato Canyon leases by the other Gato Canyon lessees to the United States.  *See Amber Res. Co. v. United States*, 68 Fed. Cl. 535 (2005), *aff'd*, 538 F.3d 1358 (Fed. Cir. 2008).

23.     The action by Nycal resulted in dismissal of Nycal's claim for lost profits, because Nycal was unable to prove that at the time the Secretary breached the Gato Canyon leases for failing to comply with his obligation to provide consistency determinations, the Gato

Canyon lessees could have carried out the milestones and then put the Gato Canyon field into production. *See Nycal Offshore Dev. Corp. v. United States*, 106 Fed. Cl. 222 (2012), *aff'd*, 743 F.3d 837 (Fed. Cir. 2014).

24.     In 2013, recognizing that Nycal's fractional interest in the Gato Canyon leases had never terminated, the United States moved within a case captioned *League for Coastal Protection v. Jewell*, Case No. 4-05-00991-CW (N.D. Cal., filed Mar. 9, 2005), for an order to lift the directed suspensions of the offshore leases in which Nycal has a fractional interest (*see* Dkt. 101, 6/10/13).  Prior to moving for judicial relief, the Regional Director of the Interior Department's Bureau of Safety and Environmental Enforcement, Pacific Region, sent a letter to Nycal at its London headquarters, confirming that the Gato Canyon leases "have not been relinquished nor have they expired due to the continued court-ordered directed suspensions on those lease."  The letter went on to say that the Department "will request permission to lift the court-ordered directed suspensions, noting that "your leases are not in the primary term, no production or operations have occurred on your leases for more than 180 days, and there is not a suspension request for these leases upon which [the Department] may act."  While Nycal received this letter, since production and operations had been halted by the 2001 District Court order and the letter appeared to invite a new suspension request only if the District Court order was dissolved, Nycal continued to pursue its damage action, which was then awaiting briefing in the Court of Appeals for the Federal Circuit.

25.     As far as Nycal knew, the Department did not pursue its proposed application to the District Court.  Unknown to Nycal, on or about June 17, 2013, the United States in fact moved to have the directed suspensions, but it never served the motion papers on Nycal.

26.     Because the United States had not served Nycal with the motion papers, the District Court required the United States to re-notice its motion within the *California v. Norton* case and serve Nycal with the motion papers.

27.     Despite the District Court's service order, the United States never served the re-noticed motion papers on Nycal, but claimed simply to have sent them by first-class mail to Nycal at its London headquarters.  *See California v. Norton*, Case No. 4:99-cv-04964 (N.D. Cal., filed Nov. 16, 1999) (Dkt. 179, 6/17/13).  Nycal denies that it ever received the re-noticed motion papers.[2]

28.     In its re-noticed moving papers, the United States acknowledged that all the leases under the 1982 sale that had been subjected to the District Court's directed suspension had remained in being throughout the duration of that suspension.  It was not until the *Amber* plaintiffs elected restitution damages did they tender their lease interests back to the United States.  Thus, those leases were relinquished in order for the lessees to obtain the return of their initial bonus payments, which occurred in April of 2009.  As Nycal elected not to seek restitution, it never tendered its lease interests back to the United States.  While the *Amber* plaintiffs denominated their tender as an assignment, and the United States viewed them as relinquishments, there is common ground that their leases terminated in 2009.  It is thus indisputable that the effect of the District Court's directed suspension was to toll the November 1999 suspensions and to continue the leases in force without any further work under the 1999 suspensions.

29.     Also in its re-noticed moving papers, the United States makes explicit that whether one views what happened in 2009 as an assignment or an abandonment, Nycal remained

---

[2] *California v. Norton* has changed captions numerous times reflecting the substitution under Fed. R. Civ. P. 25(d) of the Secretary of the Interior serving at the time of each documentary submission.

a fractional lessee of the Gato Canyon.  As the Government wrote in 2013, "All of the *Amber* plaintiffs **(except Nycal)** have relinquished their leases"[3] (emphasis added).  The Nycal leases were in existence as of the Government's 2013 motion, as Jason Ming, Regional Director, Bureau of Safety and Environmental Enforcement ("BSEE"), U.S. Department of the Interior, wrote in support of the Government's motion, "There are no pending suspension requests, and BSEE can now reasonably assume that no suspension requests will be submitted in the future.  In the absence of any pending suspension requests, BSEE has no basis for conducting any further work on CZMA or NEPA requirements."

30.     It is self-evident that were the Nycal leasehold interests not then in existence, Nycal would not have had the power to make a suspension request.

31.     As of the date of the District Court's directed suspension, at least 23 months remained during which the Gato Canyon lessees could have met their milestones.  If one assumes that the November 1999 suspensions extended the leases for five years, then as of June 2001, over three years were left on the leases.

32.     Further, it is commonplace for lessees to seek further or modified suspensions during the period of an existing suspension.  That actually occurred in February of 2000, when Samedan submitted a Project Description, and in September of 2000, when Samedan submitted revisions to that Project Description, both of which would have affected the delineation well milestone in the November 1999 suspension.  It is clear that BSEE was willing to entertain such a modification as late as 2013, for otherwise the reference to "no pending suspension requests" in Mr. Ming's submission is meaningless.

---

[3] *California v. Norton,* Case No. 4:99-cv-04964, Dkt. No. 178 (6/17/13), Federal Defendants' Motion Pursuant to Fed. R. Civ. P. 60(b) For An Order Lifting Directed Suspensions of Offshore Leases at page 4.

33.     Having not been served and having no actual notice of the re-noticed motion, Nycal did not appear or put in any responsive papers, and on July 23, 2013, the District Court granted what it denominated as the "Federal Defendants' Amended Unopposed Motion," ordering that "The lease suspensions ordered by this Court in its Order of June 20, 2001, 150 F. Supp. 2d 1046, 1057-58 (N.D. Cal. 2001) are hereby LIFTED" (emphasis in original.)  The District Court did not purport to terminate Nycal's existing fractional leasehold interests.

34.     On August 12, 2013, following the issuance of the District Court's order vacating the Suspension Order as it pertained to Nycal, the United States purported to terminate Nycal's leasehold interest because Nycal had not conducted operations on the leases and there was no pending request from Nycal to further suspend the termination of the leases.  *See* Letters dated August 12, 2013, from Joan Barminski, Regional Supervisor, Office of Strategic Resources, United States Department of the Interior, Bureau of Ocean Energy Management, to William G. Horn, Nycal Offshore Development Corporation, c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 (the "Termination Letters").[4]  Copies of the Termination Letters are attached hereto as Exhibit A.

35.     Nycal did not receive the Termination Letters, and were not aware either that the District Court had lifted the directed suspensions, or that the Secretary had purported to terminate Nycal's fractional leasehold interests after the lifting of the suspensions.

36.     In the summer of 2017, acting on newspaper articles indicating that the new Federal Administration was looking into reactivating oil and gas exploitation off the

---

[4] Nycal in 2017 sought to intervene in *California v. Norton* in order to seek, *inter alia,* a declaration that its interest in the Gato Canyon leases remained extant because the United States had not served Nycal with the motion papers supporting its request to vacate the Suspension Order.  That motion was denied on January 24, 2019, and as a result the District Court did not rule on whether its 2013 ruling vacating its 2001 Suspension Order had been properly made.  The denial of the motion to intervene is presently being appealed to the Court of Appeals for the Ninth Circuit.

California coast, Nycal undertook to ascertain whether the directed suspension of the offshore California leases in *California v. Norton*, including Nycal's, might have been modified to enable Nycal to move toward production.  Nycal was informed by counsel that according to documents filed in *California v. Norton*, the directed suspension had been lifted some four years before.

37.     In September of 2017, Nycal moved to intervene in *California v. Norton*, seeking a declaration that the July 23, 2013 Order was a nullity because of the uncontested failure of the Government to serveits motion paper.  It was only in the Government's answering papers that Nycal learned that after the District Court lifted its directed suspension, the Secretary had purported to declare the Nycal lease terminated as of the date of the lifting of the suspension. Nycal had not in fact received the Termination Letters, which were sent not to Nycal in London but to an address apparently on file with the Delaware Secretary of State in Wilmington, and directed to a William Horn, who had not worked for Nycal for 18 years.

38.     Without ever alleging that it had complied with the Court's service order, the Government focused its opposition to the Nycal motion to intervene on the timing of Nycal's motion.  The Government argued that Nycal should have intervened in *California v. Norton* in 1999, 2001, or in 2013, because other offshore lessees had done so and Nycal knew that the District Court had issued a directed suspension that halted all activity under the leases.

39.     Nycal responded that the District Court's directed suspension had the effect of freezing the leases as of the time of the Court's order.  As such, participation by Nycal in *California v. Norton* would be a pointless exercise until such time as the Court dissolved its directed suspension, and activities could re-commence under the leases.

40.     The District Court disagreed with Nycal's position, and denied its motion to intervene.

41.     Although the Court recognized that "Nycal's fractional leases remained suspended post-judgment and pending action by Defendants as ordered by this Court," it went on to write that "Nycal was aware of this case at least as early as February 24, 2005, when it filed its complaint in *Nycal Offshore Development Corporation v. United States*, 01:05-cv-00249-EGB (Fed. Cl., filed Feb. 24, 2005)."  It therefore refused to entertain Nycal's request that it re-visit its 2013 Order, holding that Nycal should have intervened years ago in order to protect its inchoate interest in resuscitating activity under the Gato Canyon leases in the event that its action for consequential damages ultimately failed.

42.     Nycal disagrees with the District Court's holding on the timeliness of its intervention motion, and is appealing that ruling.  However, because of that ruling, the District Court never adjudicated Nycal's claims that its lease rights were never terminated by the Court's 2013 order, or by the Secretary's 2013 purported letter notice of termination.

## CAUSE OF ACTION FOR DECLARATORY JUDGMENT

43.     Plaintiff realleges the contents of paragraphs 1–42 as if fully set forth herein.

44.     As of July 23, 2013, the District Court lifted the suspension of Nycal's power—under its fractional interest in the Gato Canyon leases—to proceed with the milestone activities that had been approved by the Department's suspension of November 12, 1999.  Thus, the Gato Canyon lessees were enabled to carry out their requirements to maintain their leasehold interests.

45.     At that point, since the other Gato Canyon lessees had assigned their fractional interests to the United States in order to obtain restitution of their initial lease payments, Nycal could have: undertaken the milestone activities on its own, by way of applying

to be the Unit operator; sought another proposed unit operator to carry out the milestone

activities; or proposed modifications to the existing suspension to update the development plan.

46.     The United States became the assignee of the fractional leasehold interests

in the Gato Canyon leases by separate and distinct assignments of interest, effective

automatically and immediately upon the receipt by Assignors of their respective judgment

amounts awarded in the *Amber* litigation.  Because the Gato Canyon leases remained in

existence through the completion of the *Amber* litigation, and because Nycal's fractional

leasehold interests could not be extinguished or relinquished by the other fractional lessees, as

held by Judge Bruggink of this court during the *Nycal* litigation, the *Amber* Order requiring the

return of the initial lease payments upon the tender of the fractional leasehold interests to the

Government had the effect of constituting an assignment of the returned leasehold interests, and

not a partial relinquishment.

47.     Had the United States recognized that Nycal's fractional leasehold interest

remained in being, rather than purporting to terminate that interest, upon learning of  the lifting

of the directed suspensions Nycal could and would have proposed that the Gato Canyon

hydrocarbons be accessed and produced by way of directional drilling from the existing landing

and processing facility at Las Flores, Santa Barbara County, without any penetration of the ocean

floor and without any drilling from a platform.  All production from Gato Canyon would be

landed at Las Flores, where by 2013 there was adequate processing capacity to meet the Santa

Barbara Air Pollution Control District requirements without any modifications, and without

having to traverse the sea floor through state waters.  Thus, Nycal would have been in position to

meet all the objections to development and production that had caused the dismissal of its Court

of Claims action in 2011.

48.     All of the beneficial effects that could have been realized beginning in 2013 after the lifting of the directed suspensions are available.  To Nycal's knowledge, the only barrier to a revision to the suspension of production that was in effect when the directed suspension was put in place by the District Court in 2001, a revised direction of suspension that will lead to an environmentally sound addition over the next few decades of 60,000,000 barrels of oil to the national energy reserve, is the refusal of the United States to recognize that the Gato Canyon leases remain extant.

49.     Nycal believes, based on public announcements of the Department of the Interior and meetings with representatives thereof and of the Santa Barbara Air Pollution Control District, that development of and production from the Gato Canyon Leases can be accomplished in accord with all currently applicable laws and regulations, and that this is recognized by the relevant governmental agencies.  When this alternative approach to development and production from Gato Canyon was presented to the Santa Barbara County Air Pollution Control District in January of 2018, the District representatives expressed approval of this "unique" approach, indicating as of the time of the Termination Letters the development and production obstacles that had resulted in the dismissal of Nycal's lost profits claim had been overcome.  For these reasons, a declaration from this Court that the Nycal retains its fractional leasehold interest in the Gato Canyon Leases is an appropriate use of this Court's adjudicatory powers.

WHEREFORE, Plaintiff respectfully prays that upon final hearing of the case, this Court declare that Nycal is and has been, since 1990, the owner of a fractional interest in the Gato Canyon leases.

Dated:    April 5, 2019

ANDERSON KILL L.L.P.

By: /s/ Michele A. Gallagher
Michele A. Gallagher
DC Bar No. 458349
ANDERSON KILL L.L.P.
1717 Pennsylvania Avenue NW, Suite 200
Washington, DC 20006
Telephone:  (202) 416-6500
Fax:  (202) 416-6555

*Attorneys for Nycal Offshore Development
Corporation*